C. T. BRADBURY, APPELLANT, V. JESSE KINNEY ET AL.,
APPELLEES.

FILED FEBRUARY 6, 1902. No. 11,034.

Commissioner's opinion, Department No. 1.

1. **Negotiable Mortgage Securities:** AGENCY. That a purchaser of
   negotiable mortgage securities, which are made payable at the
   office of the loan company negotiating them, knows that the
   loan company solicits payment of them regularly as they fall
   due, and that it interests itself in the payment of taxes and
   insurance to protect the security, does not make such loan com-
   pany his agent to collect, nor charge him with the moneys so
   obtained, where he has no knowledge of any claim of authority
   from him or of ownership of the securities, and he retains pos-
   session of them, and places them in the hands of another agent
   with instructions to formally demand payment.

2. **Provision for Payment of Taxes:** NEGOTIABILITY. The incorporat-
   ing into a mortgage of provisions as to payment of taxes which
   would be the mortgagee's right independent of such provisions,
   does not affect the negotiability of the instruments.

APPEAL from the district court for Wheeler county.
Heard below before THOMPSON, J. *Reversed.*

*Flansburg & Williams* and *Charles Riley,* for appellant.

*A. M. Robbins* and *T. D. Meese, contra.*

HASTINGS, C.

In this suit to foreclose a mortgage given to the Dakota
Mortgage Loan Corporation, and by it indorsed to the
Globe Investment Company, and by the latter to John
Stuart & Co. and by Stuart & Co. in turn sold and delivered
to plaintiff, appellant complains that the following find-
ings of the trial court are not sustained by evidence: (1),
That there was an agreement between Stuart & Co. and the
Globe Investment Company, by which the latter was to
collect the loan, and that this agreement was fully known
to plaintiff: (2), That the plaintiff knew of the manner
of conducting business between Stuart & Co. and the in-

vestment company; (3), That when this note became due, it was placed by plaintiff in the hands of John Stuart & Co. for collection; (4), That the interest coupons, and finally the principal note, were paid by defendant Belsley to the Globe Investment Company at its Kansas City office; (5), That the investment company was authorized to collect the money on behalf of Stuart & Co. and of plaintiff, and its payment to the investment company discharged the note and mortgage.

Whether or not the above findings are supported by the evidence seems to be the sole question presented in this case. It is true that defendant and appellee claims in his brief that there is a failure to properly allege the absence of previous legal proceedings to collect this debt, and that there is a lack of proof on that point, but the allegation in the petition seems to be broad enough, in the absence of any motion to make it more specific. The trial court, in making its separate findings of law and fact, made no finding as to the existence of legal proceedings. There is evidence in the record tending to show no previous legal proceedings had been taken. Unless the decree can be supported upon the findings in the record, it must be reversed. The mortgage was negotiated by the Dakota Mortgage Loan Corporation. The Globe Investment Company succeeded to the loan corporation, and acquired its rights and powers. It is not disputed that the mortgage and note were indorsed to John Stuart & Co., Limited, of Manchester, England, and by the latter company, without further indorsement, sold and delivered to the plaintiff. The first coupon, as it matured, was sold to John Stuart & Co., Limited. Some of the coupons were then collected through plaintiff's bankers. The last four, and the principal, as it became due, were turned over to John Stuart & Co., Limited, for collection. The mortgage ran to the Dakota Mortgage Loan Corporation, as indicated. It was paid by Christ Belsley, who had bought the land, at its maturity, by a draft sent to the Globe Investment Company at its office in Kansas City. The Globe Investment Company

was organized out of the Dakota Mortgage Loan Corporation, and is its successor. Counsel disagree as to the details of the transaction, and it has been found necessary to read somewhat carefully the entire record in this case. The facts which we have been able to find in the record, so far as they seem to bear upon the question of authority of the Globe Investment Company to collect this paper, are, in substance, as follows: The Globe Investment Company was organized in 1888 for the purpose of negotiating and selling farm mortgage securities in the manner so well known throughout the west. It absorbed and succeeded to the business of the Dakota Mortgage Loan Corporation, which had been of the same character. It negotiated loans upon security by farm mortgages, and took either a commission mortgage or a cash commission of ten or fifteen per cent. of the amount of the loan, and then sold the principal mortgage in the eastern states, or in Great Britain. John Stuart & Co., of Manchester, England, were loan and investment brokers, dealing especially in American securities. In 1890 they incorporated as John Stuart & Co., Limited, and carried on the same business under that style. They had begun dealing with the Dakota Mortgage Loan Cor: poration in 1886, and the dealing continued without any break while both parties changed names. In the course of it, the Manchester brokers purchased themselves, and took on consignment and sold to others, over $1,000,000 worth of paper. It was all made payable at the Boston office of the investment company, which had been the office of the mortgage loan corporation, where the note in question in this action was, by its terms, payable. This note and mortgage dated February 10, 1888, indorsed to the Globe Investment Company, and by it indorsed in blank, was consigned through a New York brokerage firm to John Stuart & Co., with others, amounting in all to $16,280, par value, on September 28, 1888. They were to be sold for the investment company's account and a two per cent. commission allowed to Stuart & Co. This particular mortgage was sold to plaintiff on October 12, 1888, for $709.60. The

first coupon was then past due, and seems to have been removed before sending the paper across the ocean. The plaintiff is a cotton manufacturer, seventy years of age, of Ashton-under-Lyne, England. He had no interest in Stuart & Co., nor in either of the loan companies. He had bought some mortgages of their negotiating, and got some afterwards,—seven in all. The first coupon due February 1, 1889, he sold to Stuart & Co. The next four, so far as appears, he collected through his bankers. The last four he had Stuart & Co. collect, and they charged him one-half of one per cent. for the service. He says he relied upon Stuart & Co. as his agents; that he did not know their method of procedure. January 12, 1893, he turned over to Stuart & Co. the last coupon and the principal note for collection, and on January 20, 1893, they forwarded it to Kidder, Peabody & Co., of Boston, by whose employee, Mr. Gay, it was duly presented at maturity at the office where it was payable, but the principal note was not paid. It appears that Stuart & Co. continued to purchase this paper from the investment company in large quantities until 1890, so that there was nothing to be remitted to them. When paper became due, it was sent back, and taken as so much cash on this side, in payment for new paper. In 1890 the credit of this kind of paper became impaired, and cash was called for, and proved somewhat hard to get. J. & J. Stuart & Co., of New York, were the correspondents who were relied upon to make collections, but it became desirable to have some one in Boston to do it, and in 1891, Stuart & Co., Limited, began sending their paper against the investment company to Kidder, Peabody & Co., of Boston, for collection. Mason, the treasurer of the investment company, says this was only shortly before the collapse of the company, in September, 1895; but the president, Moore, Smith, the manager of John Stuart & Co., Limited, and Gay, of Kidder, Peabody & Co., agree that it was years earlier, and the letters show that it was in 1891, and that Kidder, Peabody & Co. were expressly warned by John Stuart & Co., Limited, not to let papers go out of their hands without

payment. There was no guaranty with this loan, either by the investment company or by John Stuart & Co., Limited. The indorsements were without recourse. Mr. Bradbury says he knew nothing about the details of the management of the investment company's business. The manager of J. Stuart & Co., Limited, R. Heaton Smith, says he had some general talk with Mr. Bradbury, and explained in a general way in regard to it; but, so far as he knows, plaintiff had no particular knowledge. It is clear that, while this paper was payable at the office of the investment company, the latter was entrusted with none of it for collection in the first instance. Some of it was later turned over for foreclosure, where it was guaranteed, by reason of a contract to do so, and where, like this note, it was not guaranteed, by special arrangement with the holders. The testimony of the president and treasurer of the investment company, and of the manager of the Kansas City office was taken. They all agree to the payment by the landowner, Belsley. They do not claim any payment by themselves to any one. They testify in general terms to having authority to collect, but admit that there was no express authority, but only such as grew out of "the general course of the business." They say truly that through the Kansas City office they collected interest and principal, and remitted to the main office at Boston; that they looked after taxes; that they attended to renewal of insurance, and that at least Stuart & Co., of Manchester, knew of all this. The Kansas City office claimed no possession of the paper; it collected for remittance to Boston. It appears, as before mentioned, that in some instances the plaintiff had, by a special agreement, authorized the investment company to foreclose for him. There is a faint claim that this note in question here is not negotiable, and, as before stated, a still fainter claim to hold this decree by reason of an alleged failure to show there have been no legal proceedings to enforce it; but substantially the defense is that the note has been paid to the payee's successor under this so familiar method of doing business on the part of loan com-

panies.   There is not really a claim of any other authority.
The knowledge on the part of plaintiff is shown, against his
express, if interested, denials, only by the fact of his having
a number of the investment company's mortgages, and Mr.
Smith's statement that he supposes it was explained to
plaintiff in a general way.   That John Stuart, & Co., Lim-
ited, knew of this "general course of business," from which
the authority to act for the owner of the note is claimed,
seems clear.   John Stuart & Co., and Kidder, Peabody &
Co., were both the authorized agents of plaintiff to collect
this note when defendants paid it to the investment com-
pany.   If knowledge of an agent at the time he is charged
with the work is knowledge of the principal, then this
knowledge on their part must be attributed to the plaintiff.
It is only in this sense that there can be said to have been
any agreement between John Stuart & Co. and the invest-
ment company by which the loan was to be collected by the
investment company.   It was payable at the company's
Boston office.   It had represented that it would do all it
could to have the money there.   It was known to Stuart &
Co. to be making systematic efforts to get the makers to
give it the money.   There is much evidence, as has been
stated, that plaintiff also knew this.   But it is clear that
neither plaintiff nor John Stuart & Co. regarded these
efforts as put forth in their behalf.   The payers had stipu-
lated to have their money in the investment company's
office at a given time.   Plaintiff and his agents hoped to
find it there.   But they made sure that the paper only got
there in the hands of an agent instructed to let none of it
go without payment or special instructions.   There is no
proof in this record that the investment company ever
represented in terms that it was still owner of the paper.
It is true that its officers and agents do not seem to have
gone out of their way to say it was sold.   Their letters seem
designed to evade that point.   But the doctrine that an in-
dorsee of negotiable paper is bound to take measures to
prevent the maker or his grantee from paying it to the
original owner or to a prior indorsee, without an inquiry

as to where it is or who is claiming it, would hardly commend itself to general acceptance.

What duty did plaintiff, as purchaser of the note and mortgage, owe to the owner of the land on which it was secured? Evidently, he must not lend himself, even silently, to any known imposition. If he learns that the investment company is claiming to represent him in any way, and keeps silent, he will not be permitted afterwards to claim anything inconsistent with such action. But he is under no obligation to take measures in advance to prevent such a result. It may be that an assignee of real estate securities should be required to record his assignments in the county where the land lies or hold them subject to any payment to a prior holder; but no such requirement has been enacted in this state.

The trial court has found that this course of business between John Stuart & Co. and the investment company, was known to plaintiff, and that he knew that the Globe Investment Company was expected to collect this loan as it matured. It can not be said that this finding is unsupported by evidence, though plaintiff denies it, and the evidence is not strong. It comes, however, from Smith, the manager of Stuart &·Co. This finding does not go so far as to say, however, that such collection by the Globe Company was on behalf of plaintiff or Stuart & Co. The finding that Stuart & Co. held the note for collection when it matured, and was paid, is admitted to be true, but it is also true that they were holding it adversely to the investment company, and were sending a special employee of Kidder, Peabody & Co. with it to demand the money at that company's office, where it was payable. The finding in the record that the Globe Investment Company regularly sent notices to mortgagors, and especially to Christ Belsley, of the maturity of payments, and that the principal of this mortgage became due February 1, 1893, is also true. That on February 1, 1893, the $724 was sent by Belsley to the Globe Company in accordance with its request is unquestionable. That the money was at once forwarded to Bos-

ton, as the trial court finds, does not appear, but it was at once reported, and may be presumed to have been accounted for.

The next finding is "that under and by virtue of the arrangements made between the Globe Investment Company and John Stuart & Co., Limited, the said Globe Investment Company was fully authorized to collect said money on behalf of the said John Stuart & Co., and the plaintiff herein." This is the trial court's inference from the previous findings, and rests upon no direct testimony, and unless it is the proper legal inference from the previously found facts, it is not supported, and without it the further finding that the payment to the Globe Company discharged the mortgage and the decree canceling it, can not be sustained. In *Phœnix Ins. Co. v. Walter*, 51 Nebr., 182, and the two similar cases following that, this court holds that possession of the negotiable instrument is not indispensable to authority to collect, where it appeared that the paper had never been presented for payment at the place named, and where plaintiff had relied upon the firm of brokers at Hartford, through whom it got the paper, and upon the loan company at Red Cloud, to get its money for it, and knew they were attempting to get it for them; and held that if they did get it, plaintiff could not get it again. In those cases the course of business was the same as here, except that the paper was not presented for payment, but was placed in the hands of the loan brokers, or they were requested to look after it, and they trusted the entire matter of the collection to the loan company. In the present case the paper was placed in the hands of an independent collector, who had instructions to give it up to the Globe Company only on payment, and to make demand for it at maturity at the company's office. It is to be noted that by the terms of the loan it was the borrower's duty to get this money to Boston. It was the borrower's duty to pay taxes. The borrower was under obligation to maintain insurance. When the loan company, in selling the paper, undertook to

look after these things without charge to the purchaser, as they say in their literature they did, did that constitute them agents for the purchaser? Did the latter thereby relieve the borrower or his grantee of any part of this obligation? It is hard to see how any amount of mere knowledge on the purchaser's part that the loan company was systematically trying to get the borrowers to discharge their duty to pay taxes and insurance and get the payments to the Boston office, would make the company the purchaser's agent. Of course, if this was at the desire and instance of the holder of the paper, and substantially at his request, as in the *Walter Case,* above cited, another question would arise. The fact that the holder had actively interested himself in procuring the performance of the borrower's duties would, no doubt, make him liable for the acts of those through whom he interfered. But mere knowledge of such interference or of intended interference on the part of the loan company in obtaining the performance of the borrower's duty, either with a view to maintain its own credit or for other motives of its own, without knowledge on the part of the holder of the paper of any imposition having been practiced or intended to be practiced in his name, would not bind him. On this record the finding that this money was collected on behalf of John Stuart & Co. and of the plaintiff can not be sustained.

Appellee suggests that the instruments in question here are not negotiable. This question seems not to have been raised in any form, or in any way acted upon by the lower court, and it is not mentioned in appellant's brief. The claim made for appellee is that the provision of the mortgage that the holder may pay taxes, and have a lien for their repayment with ten per cent. per annum interest, renders the amount due uncertain, and the instrument, therefore, non-negotiable. It would seem that this stipulation added nothing to the rights of the holder, and should be treated as mere surplusage. *Wilson v. Campbell,* 68 N. W. Rep. [Mich.], 278. The case cited holds that no duty to place an assignment of record or otherwise notify a

mortgagor of the purchase of his obligation rests upon the buyer. The strongest circumstance shown in this case against the plaintiff is the fact that no assignments were even executed. This certainly shows a strong degree of confidence in the investment company. It, however, was not, as above suggested, and as the last case cited shows, a violation of any duty to defendants.

It is claimed that the last coupon for interest on this note was paid at the same time as the principal, and, as this interest was paid to and accepted by the plaintiff, the entire transaction was ratified. It is not true that this was with knowledge of the entire payment, as counsel claims. The coupon was paid, shortly after it fell due, to Kidder, Peabody & Co., by the investment company. But plaintiff says he had no knowledge of the payment of the principal until November, 1895, when he learned it from Stuart & Co., Limited, who got their information from the receiver. There is nothing to indicate that this is not true. The acceptance of this interest payment through his acknowledged agent would be no ratification of a transaction of which he remained in ignorance.

It is therefore recommended that the decree of the trial court be reversed, and the cause remanded, with instructions to enter a decree for the amount of the mortgage and interest from August 1, 1893, in favor of plaintiff.

DAY and KIRKPATRICK, CC., concur.

By the Court: For the reasons stated in the foregoing opinion, the decree of the trial court is reversed, and the cause remanded, with instructions to enter a decree for the amount of the mortgage and interest from August 1, 1893, in favor of the plaintiff.

REVERSED AND REMANDED.